# Lightcap, Appellant, *v.* Nicola.

*Practice, C. P.—Motion for judgment non obstante veredicto—Evidence —Act of April 22, 1905, P. L. 286.*

The Act of April 22, 1905, P. L. 286, is not intended to change the relative functions of court and jury, so as to permit the judge to decide questions of conflicting evidence, but only to allow him to do subsequently on review of the whole case what it then appears it would have been proper to do by a binding direction at the trial.

*Principal and agent—Serving two masters—Commissions—Vendor and vendee—Fraud—Contract—Rescission—Notice.*

Where the seller of land, or his agent in the transaction, has knowledge that there exists between the purchaser and another such a relation that it would be a breach of duty on the part of that other person to enter into a similar relation with the seller, the same principle of law which forbids him to do so while still acting for the purchaser, must forbid the seller to enter into that relation with the purchaser's agent or employee, without the knowledge and consent of his principal or employer.

The rule being not merely remedial of actual wrong, but preventive of the possibility of it, it may be invoked not only against the unfaithful agent or employee in an action involving his commissions, or other form of compensation, but also against the seller as the foundation of a right in the purchaser to rescind the contract of sale upon discovery of the constructive fraud.

The vendee's right to rescind is not affected by the fact that a part of the commission paid by the vendor to the vendee's agent was for services previously rendered by such agent to the vendor in prior transactions.

Where a vendor of land gives secret commissions to the vendee's agent, and knowledge of the fraud is discovered by another of the vendee's agents three months after the transaction, and after the expiration of such agent's employment, the notice to such agent is not notice to the vendee.

To visit the principal with constructive notice, it is necessary that the knowledge of the agent or attorney should be gained in the course of the same transaction in which he is employed by his client.

The act of a vendor in giving secret commissions to the vendee's agent, although contrary to good faith and the policy of the law, does not make the contract of sale absolutely void. Either ratification or rescission at the election of the vendee is permissible; and omission to repudiate within a reasonable time, unless explained, is conclusive evidence of an election to affirm. The election to rescind must be com-

municated to the other party. Where it is not declared in judicial proceedings, prompt repudiation and restitution as far as possible must be made by the vendee.

Where discovery of the fraud is not made by the vendee until after a suit has been brought for the balance of the purchase money, the vendee has a right to set up the fraud as a ground for rescission, and as a defense to the suit; and he may do this where there is a delay of only two months and a half after the discovery of the fraud, if there has been no such change of conditions in the meantime as to make the rescission inequitable.

Argued April 9, 1907. Appeal, No. 93, April T., 1907, by plaintiff, from judgment of C. P. No. 3, Allegheny Co., Aug. T., 1903, No. 243, for defendant non obstante veredicto in case of Gilson Lightcap, Executor of William Walker, deceased, et al. v. Frank F. Nicola. Before RICE, P. J., HENDERSON, MORRISON, HEAD and BEAVER, JJ. Affirmed.

Assumpsit to recover the balance of purchase money due under a contract for the sale of land. Before EVANS, J.

The facts appear by the opinion of the Superior Court.

Verdict for plaintiff for $36,150.50. Subsequently on motion for judgment non obstante veredicto the court entered judgment for defendant for $1,240, the hand money paid by the defendant at the execution of the contract.

*Error assigned* was in entering judgment for defendant non obstante veredicto.

*Matthew Lowrie*, with him *Robert F. Graham*, for appellant. —The question of fraud was for the jury: Ehrisman v. Roberts, 68 Pa. 311; Loucheim v. Henszey, 77 Pa. 305; Highlands v. R. R. Co., 209 Pa. 286; Zineman v. Harris, 6 Pa. Superior Ct. 303.

The evidence of the fraud must be clear and decisive: Southern Development Co. v. Silva, 125 U. S. 247 (8 Sup. Ct. Repr. 881); Grymes v. Sanders, 93 U. S. 55; Fulton v. Hood, 34 Pa. 365; Clark v. Everhart, 63 Pa. 347; Nolte v. Hulbert, 37 Ohio, 445.

The maxim that "no man shall serve two masters" does not prevent the same person from acting as agent, for certain

purposes, of two or more parties to the same transaction when their interests do not conflict, and where loyalty to the one is not a breach of duty to the other: 1 Clark & Skyles on the Law of Agency, p. 931; Mehaffey v. Ferguson, 156 Pa. 156.

Omission to repudiate within a reasonable time is evidence, and may be conclusive evidence of an election to affirm the contract. Election to rescind must be communicated to the other party : Howard v. Turner, 155 Pa. 349 ; Mehaffey v. Ferguson, 156 Pa. 156.

*John M. Freeman*, of *Watson & Freeman*, for appellee.—The testimony is undisputed that Walker was the authorized agent of the plaintiff, Lightcap, for the sale of this property, and that Cooley was in the employ of and represented Nicola in the transaction, and that Walker, without Nicola's knowledge, agreed to pay a commission to Cooley, and was therefore guilty of constructive fraud.

The principal is liable for the fraud of his agent perpetrated while acting within the scope of the agency, although the principal was innocent of any actual fraud and had no knowledge thereof: Franklin Fire Ins. Co. v. Bradford, 201 Pa. 32 ; Wolfe v. Pugh, 101 Ind. 293 ; Haskell v. Starbird, 152 Mass. 117 (25 N. E. Repr. 14) ; Fish v. Leser, 69 Ill. 394 ; Krumm v. Beach, 96 N. Y. 398 ; Busch v. Wilcox, 82 Mich. 315.

But leaving Walker out of the transaction and conceding that Lightcap innocently agreed to pay the money to Cooley for services as his agent in procuring a purchaser, then the double agency of Cooley, without the knowledge of Nicola, entitled the latter to rescind at once on discovery thereof, and this, whether Lightcap had any knowledge whatever that Cooley was acting as Nicola's agent: Rolling Stock Co. v. R. R. Co., 34 Ohio, 450 ; New York Cent. Ins. Co. v. Ins. Co., 14 N. Y. 85 ; Carr v. Natl. B. & L. Co., 167 N. Y. 375 (60 N. E. Repr. 649) ; Empire State Ins. Co. v. American Cent. Ins. Co., 138 N. Y. 446 (34 N. E. Repr. 200) ; Rich v. Black, 173 Pa. 92 ; Everhart v. Searle, 71 Pa. 256.

The adoption and ratification of the contract by Lightcap in claiming the fruits thereof and bringing suit to enforce the same, makes him liable for any fraud perpetrated by his agents

in securing the contract, precisely as if Lightcap had perpetrated the fraud himself. And this applies not only to any fraud committed by Walker, his authorized agent, but also to any fraud perpetrated by Cooley, whose employment by Walker he, Lightcap, ratified: Penna. R. R. Co. v. Flanigan, 112 Pa. 558; Story on Agency, sec. 211; Jones v. Nat. Bldg. Assn., 94 Pa. 215; Meyerhoff v. Daniels, 173 Pa. 555; Williams v. Kerr, 152 Pa. 560; Organ Co. v. McManigal, 8 Pa. Superior Ct. 632; Mundorff v. Wickersham, 63 Pa. 87; Singer Mfg. Co. v. Christian, 211 Pa. 534; McNeile v. Cridland, 168 Pa. 16; Wojciekowski v. Johnkowski, 16 Pa. Superior Ct. 444.

The facts being undisputed, the question of what is a reasonable time for the rescission of a contract is for the decision of the court: Rice v. Davis, 136 Pa. 439; Leaming v. Wise, 73 Pa. 173; Armour v. Produce Co., 28 Pa. Superior Ct. 524.

It is well settled, however, that where an agent is acting adversely to his principal and assisting in perpetrating a fraud on the principal, the principal is not chargeable with knowledge of the acts of the agent: United Security Life Ins., etc., Co. v. Central Nat. Bank, 185 Pa. 586; Sproul v. Standard Plate Glass Co., 201 Pa. 103.

OPINION BY RICE, P. J., October 7, 1907:

This was an action of assumpsit upon a contract entered into in the latter part of January, 1902, between Samuel Gilson Lightcap, executor, acting under a power contained in the will of William Walker, deceased, and Frank Nicola, for the sale to the latter of a tract of land known as the Walker farm. The price stipulated in the contract was $31,000, of which $1,000 were paid when the contract was executed by Nicola and the balance was to be paid not later than June 1, 1902, at which time the deed was to be delivered. The defense set up was that the vendor, without the knowledge of the defendant, entered into a contract with one S. B. Cooley, the defendant's agent or employee, to pay the latter a commission. The circumstances under which this commission contract was executed will be stated hereafter. It plays such an important part in the case that we quote it verbatim: " Pittsburg, Pa., Jan., 1902. It is hereby agreed and distinctly understood between the parties hereto, viz., Samuel G. Lightcap, executor, and John

Walker and Samuel B. Cooley, that, on the consummation of the sale of the Walker Farm in Baldwin Township, Allegheny County, Pennsylvania, for the sum of thirty-one thousand ($31,000) dollars, the said executor, Samuel G. Lightcap, will pay a commission for negotiating said sale, the sum of twenty-five hundred and sixty ($2,560) dollars in manner as follows: eight hundred fifty-three ($853) dollars to be paid to John Walker, and seventeen hundred six ($1,706) dollars the remainder of said commission to be paid to Samuel B. Cooley on consummation of the sale as above mentioned. Samuel · G. Lightcap (Seal), S. B. Cooley (Seal), John M. Walker (Seal)."

The court having declined the defendant's point for instruction " that under all the evidence the verdict must be for the defendant," and the jury having rendered a verdict for the plaintiffs for $36,150.50, the balance of the purchase money, the defendant moved to have all the evidence certified and filed as part of the record, and for judgment non obstante veredicto upon said record. The court sustained the motion and entered judgment in favor of the defendant in the sum of $1,240, the amount, with interest, paid by the defendant at the execution of the contract. The plaintiffs' appeal to the Supreme Court was certified to this court.

" The Act of April 22, 1905, P. L. 286, is not intended to change the relative functions of court and jury, so as to permit the judge to decide questions of conflicting evidence, but only to allow him to do subsequently on review of the whole case what it then appears it would have been proper to do by a binding direction at the trial: Dalmas v. Kemble, 215 Pa. 410; " Bond v. Penna. R. R. Co., 218 Pa. 34. See also Murphey v. Greybill, in which we herewith file an opinion (post, p. 000). Therefore, the question before us is whether the court would have been justified in giving binding instruction for the defendant. The proper decision of that question necessarily involves review and analysis of the evidence, not for the purpose of deciding disputed questions of fact, but for the purpose of ascertaining what facts are admitted, or are established by evidence of such a nature, having regard to the source from which it came, that they may be regarded as uncontroverted.

1. The defendant testified that he and Charles Donnelly were building a railroad, and preparing to go into mining operations;

that it became necessary to buy surplus land for mine openings; that James H. McRoberts was their engineer, whose duty it was to designate what land was necessary to properly place the mines; that McRoberts advised them that the Walker farm (the land in question) was important, if not absolutely essential, for their purposes; that Cooley gave similar advice; that Cooley was employed by them at a salary; and as such employee it was his duty to purchase, or assist in purchasing, these and other lands, as well as land needed by the West Side Belt Railroad, which was also part of the property owned by Mr. Donnelly and himself. Cooley, who was called and testified in behalf of the plaintiffs, at first denied that he ever was in the employ of the defendant, or ever negotiated any land purchases for him individually. But upon his memory being refreshed by cross-examination, he admitted that, although previously he was employed by McRoberts personally, yet at the time of this transaction McRoberts and he had charge of the purchasing of lands for the defendant and Donnelly necessary to open their coal; that he acted as "outside man," under the direction of McRoberts, in bringing in the parties, but the deals were usually closed by McRoberts; and that he assisted in the purchase of this property, but only to the extent of bringing the parties together. It is worthy of notice that Cooley did not deny that he had advised the defendant as to the importance of this land to his employers, as testified by the defendant; nor was he called upon by the plaintiffs to testify as to that specific allegation. It was permitted to rest where the defendant's testimony had left it. We now turn to the testimony of John M. Walker. As one of the heirs of William Walker, deceased, he had an undivided eighth interest in this land. He is the person to whom part of the commission specified in the paper of January, 1902, was to go. Upon the death of Samuel G. Lightcap, executor, who brought this action, he was appointed one of the administrators d. b. n. of the estate of William Walker, and was substituted as one of the plaintiffs. He testified that two or three months before this transaction Samuel G. Lightcap (who was empowered and directed by the will of William Walker to sell the land) told him he would give him a commission if he would sell the land for $28,000, and that later he wrote to him to the effect

that he would give him as a commission the difference between $28,000 and $31,000. As to Cooley's connection with the sale, he testified that Cooley came to him with the statement that McRoberts wanted to see him with reference to buying the farm. He, evidently, was not given to understand that Mc-Roberts personally desired to buy, but only, as Cooley said to him, "that Mr. McRoberts was the man that was doing the business." He admits that in reply to Cooley's inquiry as to the price, he told him it was $28,000. This interview resulted in an arrangement pursuant to which Walker met McRoberts on the following day and with him went to the house of Light-cap, where the contract of sale and the commission contract (each in duplicate) were executed and delivered by Lightcap. On the following day the latter was executed by Cooley and the former by the defendant, but without knowledge on his part of the commission agreement. From the testimony of the plaintiff and of the plaintiffs' witness above summarized, taken in connection with such portion of the testimony of the defend-ant as could have been contradicted by them, if it was not true, and which was not contradicted, we conclude, that the court would have been warranted in instructing the jury that Cooley was the defendant's employee and agent in the purchase of lands, and acted as such in the negotiations which culminated in the contract of sale upon which this action was brought.

2. In speaking of the relation of John M. Walker to the case we have mentioned incidently his relation to Lightcap, the vendor. As already stated, in effect, he admitted that Lightcap gave him the "privilege," or, as expressed later in his testimony, "authorized" him, to sell the land, and prom-ised to give him as a commission for his services the difference between $28,000 and $31,000, if he should be able to find a purchaser who would pay the latter sum. When he accepted this "privilege" or "authority" and proceeded to act under it, he became the vendor's agent. Accepting his own testi-mony for verity, it is beyond controversy that he acted in that capacity in the negotiations which culminated in the contract of sale. It being an undisputed and admitted fact, there was no occasion for submitting that question to the jury.

3. It was not proved that Lightcap knew that Cooley was the defendant's employee or agent; nor was it shown affirm-

atively that he was ignorant of that fact. But the testimony comes from the plaintiffs' own witnesses, and is undisputed, that Cooley by direction of McRoberts brought Walker and McRoberts together; that before they met on the day of the making of the contract of sale Walker had the commission agreement typewritten at McRoberts' office, and took it with him to the home of Lightcap where the negotiations were completed; and that on the way to Lightcap's McRoberts told him he was buying the land for the defendant. While Walker did not admit, in so many words, that he knew that Cooley was in the employ of the defendant and his associates, he did not deny it, as it would have been natural for him to do if it were not the fact. Moreover, his testimony shows that he was familiar with the office where McRoberts was employed, and that he knew, not only that Cooley was employed in the same office, but also that he was employed with McRoberts. If Walker did not know before, that Cooley was acting for the defendant in this transaction, he must have known it when he learned that McRoberts was not negotiating for the land in his own behalf, but in behalf of the defendant. With this knowledge he was instrumental in having Lightcap, his principal, sign the commission agreement contemporaneously with his execution of the land agreement. A finding that Walker did this in ignorance of the relation in which Cooley stood to the defendant would be unwarranted under his own testimony.

4. It is claimed by the plaintiffs that the testimony shows affirmatively that the commission Cooley was to receive was for services performed before he entered the employ of either the defendant or the West Side Belt Railroad—a commission earned at a time and for work done when he was the agent not of the defendant or of the railroad, but of the Walker brothers and Lightcap. In support of this contention the plaintiffs' counsel cite the following testimony of Cooley: " Q. When you went out to see Mr. Walker, you asked him the price of the property, did you ? A. I knew the price of the property; I had been trying to sell the farm for a year or more, I had an option with the Walker boys to sell that farm before ever being employed by the West Side Belt Railroad. Q. Was the option in writing? A. No, sir, a verbal option, it was a verbal agreement. Q. You had that before you went

into the employ of the West Side Belt Railway? A. Yes, sir, and I had sold it at one time, but the party backed out. Q. And did you, when you went out to talk with Mr. Walker, call his attention to the agreement that you had to sell this property? A. I told Mr. Walker if the farm was sold, that I expected to get my commission. He said all right that he would see that I would get the commission. Q. He said that he would see that you got the commission? A. Yes, sir." It is impossible to reconcile this testimony, so far as it relates to an oral promise, with the testimony of Walker, that no conversation as to the payment of a commission took place between him and Cooley prior to the execution of the commission agreement by Lightcap. But accepting this testimony of Cooley for verity, it is to be noticed: first, that it does not establish all of the facts essential to the creation of a legal obligation on the part of Lightcap to compensate Cooley for what he did in negotiating the sale to the person who backed out; secondly, that, even if it is sufficient for that purpose, it furnishes no basis upon which the amount of compensation he was entitled to can be computed; thirdly, that when the defendant's counsel interrogated the witness as to the commission he was to get under that agreement with Walker, the objection was made and sustained that it was not proper cross-examination; fourthly, that the testimony as to Walker's oral promise does not clearly show that the commission to be paid was for Cooley's services in trying to sell the land to other parties, and not for his services in negotiating the sale that was about to be made, as the paper says it was. But further, while Walker partially corroborates Cooley as to the previous efforts of the latter to sell the land, his testimony forbids the conclusion that the sum of $1,706 stipulated to be paid him in the commission agreement was exclusively for services rendered independently of the sale to the defendant. Being asked, " Why did you make an arrangement with Mr. Lightcap that Mr. Cooley was to get a commission?" he answered, " Because he helped to bring about the sale." We quote further from his testimony: " Q. How did you agree on the amount with Mr. Lightcap? A. Well, I told Mr. Lightcap that I would give Mr. Cooley that amount, and I would take the balance, because he had more to do with the sale, that is, than I had.

Q. You told Mr. Lightcap you were giving this two-thirds of the commission to Cooley? A. Yes, sir. Q. Because Cooley had more to do with the sale than you had? A. Yes, sir, that is what I said." Being interrogated as to what Cooley did in connection with the sale of the farm, he testified as follows: "Q. What did Mr. Cooley do now, in connection with the sale of this farm? A. Why, I don't know just what he did, but he brought about the sale, and sent for me to come in, that Mr. McRoberts wanted to see me, he was trying to sell it; I can't just say what work he did at all. Q. You say all he did to you was to tell you to come in? A. At that time, yes, sir. Q. And for that service you gave him two-thirds of the commission? A. That is not the only service he did. Q. What else did he do in connection with the sale of the farm? A. He was trying to sell it, trying to get a purchaser. Q. For some time before? A. Yes, sir. Q. Sir? A. I don't know how long, but for some time. Q. And who employed Cooley to secure a purchaser for the farm? A. I don't think he was employed at all, only I told him to try to see if he could bring about a sale, or get a purchaser; I told him that." It is apparent from this and other testimony of the plaintiff that compensation for the services of Cooley in bringing about the very sale in question entered into the consideration for the stipulation to pay him $1,706. To sum up: the paper furnishes very clear evidence that the commission was to be paid Cooley for services rendered by him for the vendor in the negotiations which led up to the sale in question; the testimony of Walker, one of the plaintiffs, is in harmony, to the extent above stated, with this documentary evidence; and the testimony of Cooley as to the oral promise is not in irreconcilable conflict with it. So far as the legal question before us is concerned, it is immaterial whether the stipulated commission was to be paid Cooley for his services to the vendor in bringing about the sale to the defendant exclusively, or for those services and others that he had rendered before he became the. defendant's employee and before the negotiations for the sale were begun.

5. There is no evidence that the defendant had actual knowledge of the commission agreement prior to July 1, 1903. It is true, John S. Lightcap, a witness for the plaintiffs, testified that

when he and Mr. Warden, one of the present plaintiffs, tendered the deed on May 28, 1903, the defendant said " he understood the entire matter." Mr. Warden, on the other hand, testified that the defendant's remark was that " he knew all about the Walker farm and that they wanted it in their deal." But as the first witness admitted, and the second witness did not assert the contrary, that nothing was said about the commission agreement, the defendant's remark, accepting either version of it, cannot be regarded as an admission that he knew of it at that time.

6. It is suggested that the defendant received constructive notice of the commission agreement, and hence of the alleged fraud, in the latter part of April or early part of May, 1902, in the following manner: John S. Lightcap testified that he and his associate, Mr. Warden, acting as attorneys for Samuel G. Lightcap, sought out Cooley at McRoberts' office, for the purpose of securing, if possible, the cancellation of this commission agreement. To quote his language: " We explained the situation, that Gilson Lightcap, executor, had been placed in by entering into an agreement of that kind—of having contracted, as an executor of that estate, to pay a commission of $2,560, that he would be paying more than twice as much as he would be entitled to for his services as executor in settling up the estate, and that the heirs, undoubtedly, at the time of distribution, at the time of filing the account of distribution of the estate, would have him surcharged. . . . We told him that we hadn't seen Mr. Walker yet, at this time he wasn't there, but that if the orphans' court would permit a commission for the selling of that real estate, in proportion to the services rendered, that we would not object. If they would cancel that agreement, and place in our hands a bill, at the time of the distribution, as attorneys for the estate, we would see that it is presented to the court. . That in case the court allowed the commission, in proportion to the services rendered, it was a matter he would have to prove himself in person. We would not object to it." He says that Cooley, assenting to the proposition, then and there burned the duplicate copy of the agreement he held, and subsequently sent a bill for their commission. He testified further that McRoberts was present and heard part of this conversation; but he was unable to say that he heard all of it.

Assuming that a jury could find that he heard enough of the conversation to inform him as to the existence of the commission agreement, the time when it was entered into and its provisions, how was the defendant affected with the knowledge thus acquired by McRoberts? This was three months or more after the contract of sale had been made. Although McRoberts was still in the employ of the defendant and his associates, his authority to act for them in the purchase of this particular piece of land was at an end when the contract of sale was executed. In short, the knowledge acquired by McRoberts at this interview was not gained in the transaction in which he was employed. "To visit the principal with constructive notice, it is necessary that the knowledge of the agent or attorney should be gained in the course of the same transaction in which he is employed by his client:" Hood v. Fahnestock, 8 Watts 489. "It is only during the agency that the agent represents and stands in the shoes of the principal. Notice to him twenty-four hours before the relation commenced is no more notice than twenty-four hours after it ceased would be. Knowledge can be no better than direct actual notice:" Houseman v. Girard Mut. B. & L. Assn., 81 Pa. 256; Lohr v. Philipsburg, 156 Pa. 246; Langenheim v. Anschutz Bradberry Co., 2 Pa. Superior Ct. 285, 291; Sitler v. Spring Garden Fire Ins. Co., 18 Pa. Superior Ct. 148, 156; Chester v. Schaffer, 24 Pa. Superior Ct. 162. Applying this principle, the knowledge of Cooley's relation to the defendant, which Walker, the vendor's agent, gained in the course of the negotiations which terminated in the contract of sale, was notice to the vendor, while the knowledge of the commission agreement, which McRoberts may have gained after his agency in the acquisition of this property had ceased, was not equivalent to notice of that fact to his principal. But further, and apart from the uncertainty of the testimony of John S. Lightcap as to McRoberts' knowledge of the material provisions of the commission agreement, it is to be noticed that the plaintiffs called McRoberts in rebuttal and and elicited from him the testimony in unequivocal terms, that he had "no knowledge of any agreement of any character passing between Mr. Cooley, Mr. Walker and Squire Lightcap." To charge the defendant with constructive notice of the commission agreement in April or May, 1902, the plaintiffs must

necessarily take the position that the testimony thus elicited by them was untrue; which is inconsistent, to say the least, with the position taken by them on the trial.   Upon the whole, we conclude that there is no competent evidence that the defendant had either actual or constructive notice of the commission agreement prior to July 1, 1903.

7.   The summons in the case was served on June 24, 1903, and on September 4, following, judgment was entered against the defendant for want of an affidavit of defense.   The default was subsequently explained to the satisfaction of the court upon the ground, inter alia, of his illness and absence from the city from about July 1; the judgment was opened, and the defendant permitted to defend.   The petition to open was presented on September 15, 1903, and, so far as appears, the first express notice to the vendor of the defendant's election to rescind was contained in this petition.   The fact of the defendant's illness is not controverted.   It is claimed further by his counsel, in which contention they are sustained by the report of the evidence sent up with the record, that the defendant never took possession of the land, and that there is no evidence whatever that between July 1, 1903, when he discovered the fact that the vendor had contracted to pay Cooley a commission, and September 15, 1903, when he asserted the right to rescind, any change of circumstances, of the condition of the parties, or of the property, occurred, which would make rescission inequitable.

The two legal questions which arise upon the foregoing facts, are : first, whether the defendant had a right to rescind the contract of sale, and recover the $1,000 he had paid upon its execution by him ; second, whether he exercised the right within a reasonable time.   By whatsoever name it may be called, whether that of principal and agent or of employer and employee, the relation which existed between Cooley and the defendant imposed on Cooley the duty to act with fidelity and the utmost good faith toward the defendant in purchasing or assisting to purchase this land.   When one under such obligation to the purchaser enters into such relation with the seller as is evidenced by the commission agreement in this case, without the knowledge and consent of the purchaser, he puts himself in the position of attempting to serve two masters whose

interests are opposed. This is against the policy of the law, and that, too, irrespective of the mode of compensation. A fortiori is it so, if the amount of the commission to be received from the seller depends upon the price the purchaser can be induced to pay for the land. " The ground for the disqualification," said Chief Justice THOMPSON, quoting from 8 Tomlin's Brown, 72, " is no other than that principle which dictates that a person cannot be both judge and party. No man can serve two masters. He that is intrusted with the interests of of others cannot be allowed to make the business an object of interest to himself, because, from a frailty of nature, one who has the power will be too readily seized with the inclination to use the opportunity for serving his own interest at the expense of those for whom he is instrusted. The danger of temptation from the facility and advantage for doing wrong which a particular situation affords, does, out of the mere necessity, work a disqualification : " Everhart v. Searle, 71 Pa. 256. In the same case, speaking of the argument that as the seller was not injured by the arrangement which his agent made with the purchaser, there was nothing wrong in making that arrangement, he said : " This is specious, but not sound. The transaction is to be regarded as against the policy of the law, and not binding upon a party who has a right to object to it. ' It matters not,' it is said, p. 210 of Hare and Wallace's Notes, 1 Lead. Cases in Eq., ' that there was no fraud meditated and no injury done ; the rule is not intended to be remedial of actual wrong, but preventive of the possibility of it.' This was said of anyone who acts representatively, or whose office is to advise or operate not for himself but for others." Among the numerous cases wherein the rule has been invoked against the agent no authoritative Pennsylvania case can be found where its enforcement was made to depend in any degree upon the question whether the agent was actuated by a dishonest motive, or the question whether his principal was actually defrauded : Penna. R. R. Co. v. Flanigan, 112 Pa. 558 ; Rice v. Davis, 136 Pa. 439 ; Cannell v. Smith, 142 Pa. 25 ; Finch v. Conrade's Executor, 154 Pa. 326 ; Addison v. Wanamaker, 185 Pa. 536 ; Linderman v. McKenna, 20 Pa. Superior Ct. 409 ; Marshall v. Reed, 32 Pa. Superior Ct. 60 ; Evans v. Rockett, 32 Pa. Superior Ct. 365. See also Rich v. Black et al., 173 Pa. 92 ;

Wilkinson v. McCullough, 196 Pa. 205.  Having regard to the principle upon which it rests, it cannot be said that the rule can only be invoked against the unfaithful agent or employee. Where the seller of land, or his agent in the transaction, has knowledge that there exists between the purchaser and another such a relation that it would be a breach of duty on the part of that other person to enter into a similar relation with the seller, the same principle of law which forbids him to do so while still acting for the purchaser, must, if it is worthy to be called a rule, or policy or principle of law, forbid the seller to enter into that relation with the purchaser's agent or employee without the knowledge and consent of his principal or employer. To hold that the seller, without any risk to himself, can thus be a party to the agent's or employee's breach of duty, and have the benefit of his active service, great or small, in selling the land, or the benefit of the diminution of the diligence he owes to the purchaser, would be contrary to sound principle ; it would open the door to fraud of the most mischievous character, and as difficult to detect and prove as it is mischievous.   The rule being, not merely remedial of actual wrong, but preventive of the possibility of it, it may be invoked not only against the unfaithful agent or employee in an action involving his commission or other form of compensation, but also against the seller ; and under such a state of facts as we have set forth above it must be regarded as the foundation of a right in the purchaser to rescind the contract of sale upon discovery of the constructive fraud.

The act of Cooley, in which the vendor must be held to have responsibly participated, though contrary to good faith and policy of the law, did not make the contract of sale absolutely void.  Either ratification or rescission at the election of the defendant was permissible ; and it must be conceded that omission to repudiate within a reasonable time, unless explained, would be conclusive evidence of an election to affirm. See Dunn v. Columbia Nat. Bank, 204 Pa. 53, and cases therein cited.  Speaking of cases depending upon the election of one of the parties, it has been declared : "Election to rescind must be communicated to the other party.  One way of doing that is to institute proceedings to have the contract judicially set aside ; or, if the other party is the first to sue

on the contract, the rescission, if not too late, may be set up as a defense. Where rescission is not declared in judicial proceedings, no further rule can be laid down than that there should be 'prompt repudiation and restitution as far as possible:'" Howard, Receiver of Newtown Nat. Bank, v. Turner, 155 Pa. 349. In the present case the ground for rescission, although known to the plaintiffs, was not discovered by the defendant until about July 1, 1903, which was after the suit was brought. Hence, he had a right to set it up as a defense. There is no dispute as to the facts to be considered in the determination of the question whether he exercised the right within a reasonable time; nor is there any room for difference of opinion between reasonable men as to the inferences to be drawn from the relevant and undisputed facts. There was simply a delay of two months and a half, and no evidence of such change of conditions in the meantime as would make rescission inequitable. Nor was anything necessary to be done by the defendant to restore the status quo. What would be unreasonable delay in electing to rescind a contract relative to perishable goods or of other property, which, as a matter of common knowledge, are subject to frequent and sudden fluctuation in value, would not be in the case of a contract for the sale of land, particularly where the seller's possession of the land has not been surrendered, and there is no proof of change of value, or other conditions. There are numerous cases in which the view has been expressed that, what is a reasonable time within which to exercise the right of rescission is, when the facts are undisputed, a question to be determined by the court. Many of these cases are cited in Armour v. Beaver Valley Produce Co., 28 Pa. Superior Ct. 524. And even in those cases in which the view is expressed that, in general, it is a mixed question of law and fact—which is true, if the relevant facts are in dispute, or if different inferences of fact may be drawn from the facts proved—it is conceded that the time may be so short or so long that the court will declare it to be reasonable or unreasonable as matter of law. See Portland Ice Co. v. Connor, 32 Pa. Superior Ct. 428. Without entering into a discussion of the abstract question, we conclude that under all the facts to which we have alluded the learned judge below was right in holding that the de-

fendant's right to rescind was not forfeited by unreasonable delay.

Upon the whole record we conclude that a binding direction for the defendant would have been proper; therefore, the judgment is affirmed.